# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-18-00815-CR

**Meagan Rena Work, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 167TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-14-302146, THE HONORABLE P. DAVID WAHLBERG, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

Appellant Meagan Rena Work was indicted for multiple offenses related to the death of her two-year-old son, C.T. In cause number D-1-DC-14-302145, she was charged with first-degree injury to a child causing serious bodily injury. *See* Tex. Penal Code § 22.04(a)(1), (e). In cause number D-1-DC-14-302146, she was charged with first-degree injury to a child by omission causing serious bodily injury. *See id.* § 22.04(a)(1), (b)(1), (e). In cause number D-1-DC-14-301864, she was charged with two counts of second-degree tampering with physical evidence, a human corpse. *See id.* § 37.09(c), (d)(1). Pursuant to a plea-bargain agreement, appellant entered an open plea of guilty to the injury to a child by omission causing serious bodily injury charged in cause number D-1-DC-14-302146 and the two counts of tampering with physical evidence, a human corpse, charged in cause number D-1-DC-14-301864. As part of the plea-bargain agreement, the injury to a child causing serious bodily injury charged in cause number D-1-DC-14-302145 was dismissed. The trial court found appellant guilty of all three

offenses and, after hearing punishment evidence, sentenced appellant to confinement in the Texas Department of Criminal Justice for thirty years for the injury to a child by omission and twenty years for each of the tampering offenses, *see id.* §§ 12.32, 12.33, ordering the sentences to be served concurrently, *see id.* § 3.03(a). In four points of error on appeal, appellant contends that the trial court abused its discretion in denying her second amended motion to suppress the statements that she made to the investigating officers. We will affirm.

## BACKGROUND

### Factual Background[1]

On the evening of September 10, 2014, Kevin Freed, a patrol officer with the Cedar Park Police Department, met with a concerned citizen who had come to the police station to make "an outcry about the welfare of a young child" because she believed the young boy, two-year-old C.T., was missing and had been abused. The citizen showed the officer photographs depicting the child with significant injuries that appeared, to the officer, to be inflicted rather than naturally occurring. Officer Freed conferred with his supervisors, and they determined that a welfare check on the child was warranted.

Officers eventually found the child's mother, appellant, at around 10:00 p.m. later that night at a residence on Cypress Lane, but C.T. was not with her. When the officers tried to ascertain the boy's location, appellant indicated that her son was with her friend in Sachse, which she said was a city outside of Houston.[2] The officers contacted Sachse Police to follow up on

---

[1] The facts recited are taken from the testimony and other evidence presented at the suppression hearing.

[2] The record reflects that Sachse, Texas, is a city in the Garland/Plano area, not a suburb of Houston. The Cedar Park officers testified that they were aware of this fact.

2

appellant's information—to go to the friend's home, find C.T., and conduct a welfare check on him. The Sachse Police went to the friend's house and discovered that C.T. was not there. They conveyed that information to the Cedar Park Police, along with information that appellant had texted her friend, while the Sachse Police were there, instructing her friend to tell the police that C.T. was there. The Cedar Park officers confronted appellant with the fact that her son was not at her friend's home in Sachse, but appellant insisted that she had taken C.T. to her friend's house outside of Houston. The police remained unable to ascertain the child's location or condition. After contacting the on-call detective, a decision was made to transport appellant to the Cedar Park police station to further the investigation.[3]

They arrived at the Cedar Park police station a few minutes after 11:00 p.m. (on September 10th), and appellant was taken to the "soft interview" room, which is a room with a "laid back environment" used for interviewing witnesses and victims, particularly children, that has a loveseat and toys. Christopher Dailey, a detective with the Cedar Park Police Department, began interviewing appellant around midnight. He informed her that she was "not under arrest" but was "not free to leave." He then gave her *Miranda* warnings, *see Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966) (holding that prior to custodial interrogation, law enforcement officers must advise accused of certain constitutionally protected rights to secure Fifth Amendment privilege against self-incrimination), which appellant indicated that she understood. Appellant first repeated the Sachse story previously given to the patrol officers at the Cypress Lane residence—that she had dropped C.T. off with her friend in Sachse. However, about

---

[3] Over the course of the next few days, as the investigation evolved, appellant was held in multiple locations, interviewed by officers from several law-enforcement agencies, and arrested—at different times—for various offenses. During the course of the investigation, which involved continuous attempts to find C.T., appellant's explanation about what happened to her son changed several times.

forty-five minutes into the interview, appellant admitted that she had lied about Sachse and said that C.T. had been kidnapped from her truck outside a truck stop in Austin the week before. After getting further information about that incident, Detective Dailey left the interview room.

Appellant was left alone in the soft-interview room for almost an hour, during which time she moved to the loveseat to lie down. Detective Dailey returned with a map of the area that appellant had described, and she pointed out the location where C.T. had been kidnapped. The detective again left the room at about 2:30 a.m. (on September 11th), asking appellant before he left if she needed to use the restroom. She said that she did, and the detective found an officer to escort her to the restroom. After her restroom break, appellant returned to the loveseat. Detective Dailey, his fellow detectives and officers, and officers from other law-enforcement agencies coordinated to follow up on the information that appellant had provided as well as to investigate other sources for information.

Detective Dailey returned just after 3:00 a.m. for about five minutes and asked appellant a few additional questions. Appellant asked the detective if they had "figured anything out or talked to anybody" who had information that could help them find C.T. When he told her that they were "still working on it," she asked, "You still don't know anything?" The detective told her that he would "let [her] know." While the police efforts to find C.T. were ongoing, appellant slept on the loveseat. As part of their efforts, police obtained search warrants for appellant's truck, which they considered to be a crime scene based on appellant's statement that C.T. had been kidnapped from there, and appellant's cell phone in order to gain possible information to assist in locating C.T.

About one and a half hours later, in the early morning hours of September 11th, Lieutenant Chanse Thomas, another detective with the Cedar Park Police Department, joined

4

Detective Dailey in interviewing appellant. They woke up appellant at approximately 4:20 a.m. and asked her if they could "talk to [her] a little bit more." She said, "Yeah." She told them that she was not feeling good and felt like throwing up. Lieutenant Thomas offered her the trashcan, and she explained that "that's why [she] had it."[4] She did not indicate that she needed medical assistance or say that she could not talk to them because she was not feeling well. Detective Dailey asked appellant if she was hungry; she said that she was not and confirmed that she still had water.[5] He then again gave appellant *Miranda* warnings since the lieutenant had joined the interview. Appellant orally confirmed her understanding of each of the constitutional rights. Detective Dailey asked appellant if she "still want[ed] to talk to [them]," and she said, "Yes, sir." Lieutenant Thomas then asked appellant if she was hungry or if "food might help [her]." They briefly discussed her pregnancy, and appellant told them that she was four months pregnant. Lieutenant Thomas again asked appellant if she was hungry, and she said that she was "not really hungry." He told her that if she got hungry to let them know "so [they] [could] go get something for [her]." In the ensuing interview, appellant persisted in her story that C.T. had been kidnapped from her truck. A few minutes before 5:00 a.m., the lieutenant again asked appellant if she wanted something to eat, and she declined. He asked if she was sure, offering "something from Jack-in-the-Box, Whataburger, anything like that," and she confirmed that she did not want anything to eat. He also offered appellant water but noted, as she indicated, that she already had some water. The detectives then left the interview room. A few minutes after they left, appellant vomited intermittently for about five minutes into the trashcan.

---

[4] The record indicates that, at some point after Detective Dailey left the room at around 3:10 a.m., appellant moved the trashcan close to her.

[5] The record reflects that, before being taken to the soft-interview room, appellant had been provided water.

About twenty minutes later, at 5:18 a.m., the detectives returned and confronted appellant with the fact that the information that she had provided about the kidnapping conflicted with information that the various law-enforcement officers had gathered in their efforts to find C.T. They informed her that officers had talked with her boyfriend, Michael Turner, in the San Saba County Jail, and he had told them that she let C.T. go with some people at a Chick-Fil-A. Appellant then described giving C.T. away to a man and woman, unknown to her, in a Chick-Fil-A parking lot at the beginning of August. She told the detectives that she was on the side of the road with C.T. asking for money and a place to stay when a man and woman pulled over into the Chick-Fil-A parking lot. She said they discussed her situation, prayed together, shared a meal, and then she gave C.T. to them. Appellant did not know their names, because she did not ask, and said that they were "not from around here." She described the couple, gave the approximate ages of two children the couple had with them, and described their car. She told the detectives that they could get the footage from the security camera at the Chick-Fil-A to confirm her story and get information about the couple's car. The detectives left the interview room at 5:55 a.m.

They returned over an hour later, at approximately 7:12 a.m., and woke up appellant who was asleep on the loveseat. Lieutenant Thomas again offered appellant something to eat, which she again declined. The detectives informed appellant that they were unable to confirm her story; other officers did not locate video footage from the Chick-Fil-A security camera showing a woman and child (appellant and C.T.) as she had described. The detectives confronted her with the "farfetched" nature of her story, but she continued to insist that she had given C.T. to this couple. She provided further details of the encounter with the couple and described what C.T. was wearing when she gave him away. The detectives again expressed their

6

doubt about the Chick-Fil-A story and implored appellant to tell the truth about what had happened so they could find C.T. After about an hour, the interview concluded. Detective Dailey offered appellant water and a restroom break, which she indicated that she needed, and Lieutenant Thomas offered her a breakfast taco, which she accepted. The lieutenant brought the taco, and appellant was escorted to the restroom. After she returned, she did not unwrap or eat the taco. Instead, she left the food untouched on the table and returned to the loveseat. Appellant remained in the soft-interview room alone, resting on the loveseat, until Detective Dailey returned at 8:48 a.m. and informed her that she was going to be charged with child abandonment.[6] Appellant asked some questions about what would happen to her—if she would stay in jail until her son was found, if there was a way to bond out, and if she would get a trial. The detective informed her that the answers to those questions were "beyond [his] scope" because those were decisions that would be made by others.

Detective Dailey then brought in social workers from Child Protective Services (CPS) who spoke with appellant. Appellant repeated the Chick-Fil-A story to the CPS workers. When asked if "something bad happen[ed] to C.T.," appellant explicitly denied that anything bad had happened to her son and insisted that she was telling the truth. The detectives, who were also present in the interview room, confronted appellant with inconsistencies between what she had just told the CPS workers and what she had previously told them. One of the CPS workers expressed to appellant that she found her story about giving C.T. away to strangers at Chick-Fil-A difficult to believe. She also conveyed to appellant that everyone was concerned about C.T. and wanted to find him and ascertain if he was safe. After appellant once again

---

[6] The record reflects that the detective prepared a complaint, which was notarized, but no arrest warrant or commitment order was issued.

7

insisted that she was telling the truth and "had told [them] everything," the CPS worker asked if appellant had any questions, and appellant responded that she did not. At 9:44 a.m., the detectives and the CPS workers left the interview room.

Appellant remained in the soft-interview room alone for the next five hours, and the record indicates that appellant slept during the interim. At approximately 3:11 p.m., Detective Dailey returned. He asked appellant if she had rested, and she indicated that she had, expressing surprise that it was afternoon. He asked appellant if she wanted something to eat, offering her "pizza or something," and water. Appellant said that she would "try" the pizza and asked to go the restroom. The detective left to get a female officer to escort her to the restroom. While she was waiting for the escort, another officer entered the room and asked appellant if she wanted some pizza. She explained that the detective was already arranging it. After the restroom break, appellant was provided the pizza, which was cold, and a cup of water. She picked at the pizza, eating only one or two bites. Appellant remained at the table for the next half hour but did not eat.

At one point, at about 3:47 p.m., she retrieved the trashcan and positioned herself over it. She burped (or heaved) once but did not appear to actually vomit. A few minutes later, a uniformed officer entered the room and asked appellant if she was "doing alright." She responded, "Yeah," but complained that she had dropped her bracelet. She located her bracelet and retrieved the trashcan, holding it as she sat in the chair. She positioned herself over the trashcan, but she did not vomit or heave further at that time. Ten minutes later, the officer offered appellant more water, which she declined. She remained positioned over the trashcan, heaving or spitting into the trashcan a few times, until, at about 4:10 p.m., Detective Dailey returned. He asked appellant if she was "doing alright." She said, "Yeah," but that she was

8

"sick" and "queasy really bad." Seeing the trashcan, he asked if she had been "sick" again, and appellant said that she was "cramping" and "[felt] sick." Appellant did not ask for medical attention. The detective asked appellant if she wanted more water, which she declined. He then informed her that they needed to ask her further questions but had to switch rooms.

Appellant was taken to the "hard interview" room (the normal suspect-interrogation room) to meet with Robert Gutierrez, an FBI agent from San Antonio. When she walked into the room, appellant was crying. Agent Gutierrez asked her why she was crying. She told him that she was "hurting really bad" and "cramping really bad." The agent sought clarification about her condition and asked if this was due to her menstrual cycle. Appellant informed him that she was pregnant. He immediately asked if she needed medical assistance, which she declined, saying that she was "okay." He indicated that he was "serious" about getting her medical attention, and she repeated that she was "okay."

The agent advised appellant of her constitutional rights, and she signed a form at 4:14 p.m. indicating that she understood the *Miranda* warnings and her rights. He then explained the polygraph exam to her and asked if that was something that she would agree to do if it was needed. Appellant equivocated in her response, saying, "Um, yeah, but . . . I mean, yeah." Agent Gutierrez sought to clarify her response, asking her what questions he could answer for her "up front." Appellant said that she did not know if she "need[ed] to try to talk to a lawyer or what." The agent responded, "Tell you what. We can talk about this here in a little bit — this aspect" as he set aside the polygraph paperwork. He next asked appellant if she had any health issues other than her pregnancy. She said, "No," but then said that she was "borderline diabetic." He asked if she took medication for that, and appellant said, "No." He then asked her if she had slept today, and she responded that she had. He asked her if she felt rested and "felt okay," and

9

she said, "Yes." Agent Gutierrez then obtained general background information from appellant and explained the FBI's involvement in the situation. He told her that local, state, and federal law-enforcement officers had an obligation to find C.T. Appellant explained the reasons that she had given different stories about what happened to C.T. and repeated the Chick-Fil-A story to the FBI agent.

After talking with appellant for about an hour, Agent Gutierrez reintroduced the idea of appellant taking a polygraph. At approximately 5:20 p.m., he explained to appellant her rights related to the polygraph, and appellant signed a consent to an interview with polygraph, agreeing to submit to a polygraph examination. The agent asked appellant how she was feeling, and appellant said that she was "okay." He noted appellant's hand on her side and told her that he needed to understand how she was feeling. Appellant said she was cramping, and they discussed her pregnancy. Appellant explained that she "passed out regularly," was "constantly sick," and "cramp[ed] all the time." Agent Gutierrez expressed that he "was not a doctor" and that he was relying on appellant to communicate her status to him. Appellant said that she was hurting but did not ask for, or express a need for, immediate medical attention. The agent offered appellant a restroom break, which she declined. He briefly left the room to confer with other officers. When he returned, he asked appellant how she was doing, and she said that she was "okay." They continued to discuss appellant's story that she gave C.T. away to a couple at Chick-Fil-A. At approximately 6:15 p.m., Agent Gutierrez offered appellant a break and asked her if she needed to go to the restroom, and she indicated that she did.

Agent Gutierrez left the room to get a female officer to escort appellant to the restroom. While he was out of the room, appellant retrieved the trashcan, positioned herself over it, and vomited a small amount. When Agent Gutierrez returned, he noticed the trashcan and

10

asked appellant if she had vomited. She confirmed that she had. He asked her how she was feeling, and she said, "Okay." He offered her water, which she accepted, and he left to get it. When he returned with the water, they discussed how she was feeling. He expressed that he could not tell how she was feeling by looking at her and again told her that it was "up to her" to communicate how she was feeling. She conveyed that she was "okay" and, further, that she was "okay" to do a practice polygraph, which began at approximately 6:36 p.m. After the practice polygraph, appellant told Agent Gutierrez that she was comfortable continuing with further relevant questions. The polygraph began at approximately 6:45 p.m. and lasted about twenty-five minutes. Agent Gutierrez then again left the room to confer with other officers. While he was out of the room, appellant positioned herself over the trashcan but did not vomit. When the agent returned, he again asked appellant how she was doing, and she again said that she was "okay." He asked if she was still feeling "the same," and she said that she was feeling "shaky." He advised her to take a drink of water, which she did. She then indicated that she was "okay."

Agent Gutierrez then sat down with appellant and, at about 7:12 p.m., informed appellant that she was "not passing" the polygraph. He explained that law enforcement needed to find C.T. For approximately the next hour, the agent reviewed the details of appellant's Chick-Fil-A story with her. He implored appellant to be honest and repeatedly attempted to obtain additional information from her that would assist them in locating C.T. At 8:35 p.m., appellant was offered, and took, a restroom break. Agent Gutierrez again left the room. On his return, he offered appellant a drink, which she declined. He again asked appellant how she was feeling, and she again said that she was "okay." The interview resumed, and appellant revealed that she and Turner had planned to give C.T. away "to someone." At around 9:00 p.m.,

11

Agent Gutierrez offered appellant an energy bar, which she accepted. She ate a few bites, explaining to Agent Gutierrez that she had tried to eat earlier but felt sick. The interview continued, and appellant adamantly insisted that nothing had happened to C.T.

At approximately 9:20 p.m., Lieutenant Thomas entered the room with an officer who took a sample of appellant's DNA by buccal swab. The lieutenant informed appellant that they were going to put information out on the media to try to find C.T. He then formally arrested her for endangering a child at 9:22 p.m. He expressed that law enforcement had concerns that C.T. was "seriously injured" and, one last time, implored appellant to consider telling them the truth. Lieutenant Thomas and Agent Gutierrez left the room, and appellant was then left with a uniformed officer to await transport to the jail. The officer saw the trashcan and asked appellant if she had vomited. She confirmed that she had earlier, and he asked why. She said that she was sick. He asked if she was still sick, and she told him that she was "just pregnant." Appellant left the hard-interview room at 9:47 p.m.

She was transported to the Williamson County Jail, where she was booked into the jail at approximately 10:20 p.m. (on September 11th) and charged with the felony offense of abandoning or endangering a child. She was not booked into the jail for any other offense. The record reflects that appellant was seen by medical personnel approximately fifteen minutes later. The medical intake screening forms in the jail medical records, one of which appellant signed, indicate that appellant was four months pregnant with a high-risk pregnancy and that she responded "no" when asked if she was "currently experiencing pain." The intake evaluation form reflects that appellant was demonstrating "no acute distress" at that time. The record also reflects that, for the duration of her stay in the Williamson County Jail, appellant was housed in the infirmary in a "medical cell," which had a bunk, shower, toilet, and desk.

12

Throughout the night, law-enforcement officers from multiple agencies continued their investigation and their efforts to find C.T. As part of those efforts, officers repeatedly interviewed Turner in jail. Eventually, Turner admitted that C.T. was dead and led officers to a location in Travis County where he and appellant had buried the two-year-old child. Police recovered a child's body buried at that location.

At approximately 4:40 a.m. on September 12th, after police had recovered the child's body (which they believed to be C.T. but had not yet confirmed), appellant was interviewed at the Williamson County Jail by Anthony Nelson, a detective from the Austin Police Department, and Lieutenant Thomas. Before the interview began, Detective Nelson gave appellant *Miranda* warnings, and she orally confirmed that she understood her rights; she agreed to talk with the detectives. Appellant initially repeated the Chick-Fil-A story—that she had given C.T. to the couple at Chick-Fil-A—until the detectives confronted her with the fact that they knew that C.T. was dead, that Turner had taken them to the burial site in Southeast Austin, and that they had found C.T.'s body. Appellant then told the detectives that C.T. had died after having a seizure. She explained that C.T. had a seizure "for no reason" and that she and Turner had taken him to the hospital but did not go inside because they feared authorities would take C.T. because of injuries on his body, which she claimed were inflicted by her father several weeks before the seizure. Appellant told the detectives that they sat outside the hospital for about an hour while C.T. was seizing, but that he started looking better so they returned to their motel room and went to bed. She said that when she woke up, C.T. was dead.

During the interview, appellant described a "fluid-filled" bump that C.T. had on his forehead above his eye, which worsened over time to the extent that the child's nose and eye had also swelled. She attributed the bump to C.T. being injured, though she did not know how or

13

by whom, approximately two weeks before his death while C.T. was with her father, who was watching C.T. while appellant was at work. Appellant also told the detectives that Turner had buried C.T. but later dug up the child's body, and the two of them found a different burial site where Turner again buried C.T. The interview lasted approximately two and a half hours, ending at about 7:00 a.m. At no point during the interview did appellant express discomfort, exhibit nausea, or vomit.

Testimony from the suppression hearing reflects that, throughout the day (of September 12th), discussions took place between the Cedar Park Police Department and the Williamson County District Attorney's Office about dropping the charge of abandoning a child against appellant because, as Detective Nelson explained,

> The charges that she was held for in Williamson County, being abandoning the child, were false, and we all knew they were false because now we know the child's body is in the ground in a grave in Austin, Travis County, Texas. So we could not in good conscience allow those charges in Williamson County to go forward. So she was going to be charged [by the Austin Police Department] with tampering with physical evidence, [for] burying her child.

Later that evening (of September 12th), at approximately 6:40, appellant was transported from the Williamson County Jail to the Travis County Jail by officers from the Austin Police Department. At that time, less than twenty-four hours after appellant was booked into the Williamson County Jail for abandoning a child and less than forty-eight hours after Detective Dailey informed her that she was not free to leave in the soft-interview room—all Williamson County charges were disposed of.[7] When the APD officers met appellant at the jail,

---

[7] Defendant's Exhibit #3, the Williamson County Prisoner Transfer Information Sheet, which was admitted during the original suppression hearing, reflects that "All Williamson County Charges are disposed of" and that the inmate did not need to return to Williamson County. In addition, the comments section of the form specified "Do Not Return."

14

she had an insulin tube with her, given to her by the Williamson County Jail medical personnel. When one of the transporting officers asked what she had, appellant explained that it was insulin. The officer then asked if she was diabetic, and appellant told the officer that she was "borderline" Type I diabetic but was "not insulin dependent." Before placing her in the patrol car, the transporting officers informed appellant that she was under arrest for "tampering with evidence" and advised her that the child-abandonment charge had already been dropped.

During the transport to the Travis County Jail, in response to questions from the transporting officers, appellant provided information about C.T.'s medical records, which was then given to the medical examiner to assist in identifying the body recovered from the burial site in Southeast Austin. Appellant was booked into the Travis County Jail at approximately 8:30 that evening (of September 12th). She was taken to the jail nurse upon her arrival, and after a medical intake evaluation indicated dehydration and high ketone levels, she was taken to Brackenridge Hospital where she was treated for nausea and vomiting, dehydration, and high ketone levels. She arrived at the hospital at around 10:00 p.m. She was given fluids to rehydrate her and clear the ketones from her system (through urination) and was given medication for nausea and vomiting. Appellant was discharged from the hospital several hours later, at around 2:00 a.m. (on September 13th), and was returned to the Travis County Jail.

Later that day (of September 13th), at around 3:00 p.m., appellant was transported from the Travis County Jail to the Austin Police Department for another interview with Detective Nelson who was joined by APD detective Ray Tynes. Once in the interview room, Detective Nelson offered appellant a snack, which she accepted, and he provided her with pretzels and a drink. He once again gave appellant *Miranda* warnings, advising her again of her constitutional rights. She orally indicated that she understood her rights and that she wanted to talk with the

15

detectives. Appellant repeated the seizure story except this time she blamed Turner for C.T.'s head injury, claiming that he had caused C.T.'s head to hit the air-conditioning unit inside the motel room before the seizure. She explained that Turner had put C.T. in "time out," which involved making the two-year-old child stand on a chair and remain standing while looking up at the ceiling. She said that C.T. had failed to keep his head up and stand straight, so Tuner had "whupped" C.T. The child fell and hit his chin and then his head on the AC unit. According to appellant, after that, C.T.'s chin was bruised and his head "swelled up so fast" and "kept growing and growing." Nevertheless, Turner made the child continue to stand in time out after he had been injured. When they left the motel room an hour and a half later, they tried to walk C.T. out to the truck, but the child could not walk and "would fall over." Appellant carried C.T. to the truck; he was crying, he was "really sleepy," and his nose was bleeding. They drove to Turner's place of employment. Turner went inside while appellant stayed in the truck with her son. Appellant told the detectives that, at that point, C.T. started seizing. She screamed for help, and Turner came out of the business. He got in the truck, and they drove off.

Appellant admitted to the detectives that she thought that her son needed medical attention at that time because "he was definitely not acting normal." However, she and Turner decided not to take C.T. to the hospital because C.T. was bruised,[8] and Turner was afraid he would go to prison, and she feared that CPS would take her son away from her. Instead, they took C.T. back to their motel room where, over the next twelve hours, his condition worsened. Appellant explained that her son was unresponsive—his eyes were open but "he wasn't there . . . his eyes were hollow"—and he was "completely limp." He could not walk, could not talk (he

---

[8] Appellant explained that C.T. was bruised across his lower back, buttocks, and thighs from Turner "whupping" him.

only moaned), and could not drink (the water just dribbled out of his mouth). Appellant said that she laid on the bed with C.T. and held him all night until she fell asleep for about thirty minutes. When she woke up, C.T. was dead.

Appellant said that they stayed in the motel room that day, and then she helped Turner bury C.T. that night. Appellant said, however, that she felt that C.T. was not buried deep enough so she made Turner "unbury" her son, and they returned to the motel with the child's body that night. They stayed in the motel until the following evening. They left just as it was getting dark and buried C.T. in Southeast Austin—at the location where police later recovered the child's body. At the end of the interview, which lasted about two and a half hours, Detective Nelson offered appellant some water, which she declined, and a restroom break. She returned from the restroom break at 5:30 p.m. with an additional snack (more pretzels) provided by the detectives. She remained in the interrogation room by herself until she left at 5:52 p.m. and was returned to the Travis County Jail. At no point during the interview did appellant express discomfort, exhibit nausea, or vomit.

At 1:45 a.m. on September 14, 2014—approximately thirty-one hours after appellant was arrested at the Williamson County Jail for tampering with physical evidence and about twenty-nine hours after she was booked in to the Travis County Jail for that offense—an arrest warrant was issued for appellant, charging her with tampering with physical evidence for her role in concealing C.T.'s body by burying it. Approximately one and a half hours later, at 3:26 a.m., appellant was taken before a magistrate for the charge of tampering with physical evidence—approximately thirty-three hours after appellant was arrested for that offense. After further investigation by the Austin Police Department, additional arrest warrants charging

17

appellant with injury to a child and injury to a child by omission were issued on October 24, 2014. She was arrested for those offenses that same day.

**Procedural Background**

Appellant was subsequently indicted for injury to a child causing serious bodily injury (for inflicting C.T.'s head injury), injury to a child by omission causing serious bodily injury (for failing to obtain medical treatment for C.T.), and two counts of tampering with physical evidence (for her role in burying C.T.'s body twice). Appellant filed a pretrial motion to suppress evidence in which she sought the suppression of, among other things, all of the statements that she made to law-enforcement officers, contending that they were the result of an unlawful seizure of her person.

The trial court conducted a four-day hearing on the motion and issued a written order granting the motion in part and denying it in part. The trial court suppressed only the statements that appellant made to law-enforcement officials from the time she was placed in the "soft interview" room at the Cedar Park police station and told she was not free to leave until she was released from the hospital and returned to the Travis County Jail because, the trial court concluded, those statements were the result of an unlawful arrest.[9] The State appealed the trial court's suppression order.

On appeal, this Court reversed the trial court's order, concluding that:

> As noted previously, the trial court's historical fact findings regarding the interaction between law enforcement officers and [appellant] are supported by the

---

[9] The trial court concluded that the taint of the unlawful arrest had been sufficiently attenuated upon her release from the hospital and, thus, did not suppress any statements that appellant made to law-enforcement officers after that.

18

record.[10]  These facts support the trial court's conclusion that [appellant] was arrested when she was detained in the "soft interview" room at the police station and told she was not free to leave.  However, nothing in the record supports the trial court's conclusion that the arrest was unlawful.  The conclusion about the illegality of the warrantless arrest does not flow from the court's fact findings.  The undisputed facts and circumstances—that [appellant] lied to the police officers about C.T.'s location when they were investigating his status as a missing, and possibly injured, child—gave the officers probable cause to believe that [appellant] had committed the offense of false report regarding a missing child.  Furthermore, [appellant's] commission of that offense in the presence of the officers gave them the authority to arrest her without a warrant.  Probable cause to arrest and the statutory authority to make that arrest rendered [appellant]'s arrest lawful.  Therefore, the trial court's conclusion that [appellant]'s arrest was unlawful is not supported by the record.

*State v. Work*, Nos. 03-15-00730-CR, 03-15-00731-CR, & 03-15-00732-CR, 2016 WL 7335846, at *9 (Tex. App.—Austin Dec. 16, 2016, pet. ref'd) (mem. op., not designated for publication). Accordingly, we held that the trial court abused its discretion in granting, in part, appellant's motion to suppress her statements.  *Id.*  We reversed the trial court's suppression order and remanded the causes to the trial court for further proceedings.  *Id.*

After the case was remanded, appellant filed a second amended motion to suppress seeking to suppress, among other things, the statements that she made to investigating officers.[11]  Based on this Court's conclusion that appellant had been arrested for false report

---

**10**  In the opinion, we set forth only the fact findings relevant and necessary to this Court's consideration of the custody issue and specifically held, "These historical fact findings are supported by the record."  *State v. Work*, Nos. 03-15-00730-CR, 03-15-00731-CR, & 03-15-00732-CR, 2016 WL 7335846, at *5 (Tex. App.—Austin Dec. 16, 2016, pet. ref'd) (mem. op., not designated for publication).  This holding—that the record supported the trial court's historical facts findings—was limited to those fact findings set forth in the opinion as part of our review of the custody issue.  *Id.*

**11**  Appellant filed three separate motions relating to the suppression of evidence, including her statements to investigators.  At the hearing, appellant pursued only her second amended motion to suppress, which, she informed the trial court, incorporated all the issues raised in the three motions.

regarding a missing child at the point that Detective Dailey told her that she was not free to leave when they were in the soft-interview room, appellant argued that the failure to take her to a magistrate in a timely manner following that arrest required the suppression of her statements. In addition, she argued that her statements were involuntarily made because purported misstatements of the law by investigators rendered the repeatedly given *Miranda* warnings "void" and, thus, her statements should be suppressed.

The trial court conducted a three-day hearing; no evidence was offered or admitted, the parties simply presented argument based on the evidence adduced at the previous suppression hearing, of which the trial court took judicial notice, and this Court's opinion. At the conclusion of the hearing, the trial court denied appellant's second amended motion to suppress evidence. The trial court later entered findings of fact and conclusions of law in an order denying appellant's motion,[12] which concluded:

> The State failed to comply with Article 15.17, TCCP. There was a causal connection between that delay and statements made by Meagan Work. However, Work was properly warned of her *Miranda* rights on five occasions. Despite multiple factors to the contrary, after careful consideration of the totality of the circumstances, the Court concludes Work's statements were voluntary. In accordance with *Cantu v. State*, the motion to suppress those statements is hereby denied.

Subsequently, pursuant to a plea-bargain agreement, appellant entered an open plea of guilty to the first-degree injury to a child by omission causing serious bodily and the two

---

[12] In these findings, the trial court noted that the parties stipulated that the evidence adduced at the original suppression hearing be considered for appellant's second amended motion to suppress. The trial court also incorporated its prior findings of fact "as upheld by the Third Court" into the fact findings on the subsequent motion. As we noted in footnote 10, however, the fact findings that this Court upheld in its prior opinion were limited to those set forth in the opinion as part of our review of the custody issue.

counts of second-degree tampering with physical evidence, a human corpse.[13]  After a three-day punishment hearing, the trial court sentenced appellant to confinement in the Texas Department of Criminal Justice for thirty years for the injury to a child by omission and twenty years for each tampering with physical evidence, ordering the sentences to be served concurrently.  This appeal challenging the trial court's denial of appellant's second amended motion to suppress her statements followed.[14]

## STANDARD OF REVIEW

We review a trial court's ruling on a motion to suppress evidence for an abuse of discretion, *State v. Cortez*, 543 S.W.3d 198, 203 (Tex. Crim. App. 2018); *Furr v. State*, 499 S.W.3d 872, 877 (Tex. Crim. App. 2016), applying a bifurcated standard of review, *State v. Arellano*, 600 S.W.3d 53, 57 (Tex. Crim. App. 2020); *Lerma v. State*, 543 S.W.3d 184, 189–90 (Tex. Crim. App. 2018).  We afford almost total deference to the trial court's findings of historical fact and determinations of mixed questions of law and fact that turn on credibility and demeanor if they are reasonably supported by the record.  *Arellano*, 600 S.W.3d at 57; *Sims v. State*, 569 S.W.3d 634, 640 (Tex. Crim. App.), *cert. denied*, 39 S.CT. 2749 (2019).  We review *de novo* a trial court's determination of legal questions and its application of the law to

---

[13]  The conviction for injury to a child by omission charged in cause number D-1-DC-14-302146 is the subject of the instant appeal.  The convictions for the two counts of tampering with physical evidence charged in cause number D-1-DC-14-301864 are the subject of the appeal in cause number 03-19-00961-CR pending in this Court.  The Court of Criminal Appeals granted appellant an out-of-time appeal in cause number D-1-DC-14-301864 when notice of appeal was not timely filed in that cause.

[14]  In cause number D-1-DC-14-302146, appellant filed a motion for new trial, which was overruled by operation of law.  *See* Tex. R. App. P. 28.1(c).

facts that do not turn upon a determination of witness credibility and demeanor. *Arellano*, 600 S.W.3d at 57; *Sims*, 569 S.W.3d at 640.

In our review, we must view the evidence in the light most favorable to the trial court's ruling. *State v. Garcia*, 569 S.W.3d 142, 152 (Tex. Crim. App. 2018); *Furr*, 499 S.W.3d at 877. "The prevailing party is afforded the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it." *Wade v. State*, 422 S.W.3d 661, 666–67 (Tex. Crim. App. 2013); *State v. Woodard*, 341 S.W.3d 404, 410 (Tex. Crim. App. 2011). When the trial court makes express findings of fact, as it did here, we determine whether the evidence, viewed in the light most favorable to the trial court's ruling, supports the fact findings. *Garcia*, 569 S.W.3d at 153; *Johnson v. State*, 414 S.W.3d 184, 192 (Tex. Crim. App. 2013). We overturn the trial court's ruling only if it is arbitrary, unreasonable, or "outside the zone of reasonable disagreement." *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014); *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). Further, we will uphold the ruling if it is correct on any theory of law applicable to the case that is reasonably supported by the record. *Arellano*, 600 S.W.3d at 57–58; *State v. Ruiz*, 581 S.W.3d 782, 785 (Tex. Crim. App. 2019).

## DISCUSSION

In four points of error, appellant challenges the trial court's denial of her second amended motion to suppress the statements that she made to investigating officers during her custodial interrogation before she was taken to a magistrate. In her first point of error, appellant contends that her statements should have been suppressed because they were involuntarily made. In her second point of error, she argues that her statements should have been suppressed because law-enforcement officers failed to take her to a magistrate without unnecessary delay in violation

22

of article 15.17 of the Code of Criminal Procedure.[15]  In her third point of error, appellant maintains that her statements should have been suppressed because she was denied the opportunity to be released from custody on the misdemeanor on a personal bond pursuant to article 17.033 of the Code of Criminal Procedure.  Finally, in her fourth point of error, she asserts that her statements should have been suppressed because the alleged failure to take her before a magistrate in a timely manner as statutorily required denied her "the protection afforded her by the Fourth Amendment."

### Delay Before Being Taken to Magistrate

Appellant argues that the statements that she made to investigating officers during her custodial interrogation should have been suppressed because law-enforcement officers delayed taking her before a magistrate and thus violated the statutory provisions requiring that an arrestee be taken before a magistrate without unnecessary delay.

Article 14.06 of the Code of Criminal Procedure requires that upon making an arrest, "the person making the arrest or the person having custody of the person arrested shall take the person arrested or have him taken without unnecessary delay, but not later than 48 hours after the person is arrested, before the magistrate[.]"  Tex. Code Crim. Proc. art. 14.06(a).  On being taken before a magistrate, the magistrate "shall immediately perform the duties described

---

[15] We note that the parties and the trial court refer to article 15.17 when addressing the failure to take appellant before a magistrate in a timely manner.  However, because appellant was arrested without a warrant, the applicable statutory provision regarding taking appellant before a magistrate is article 14.06 of the Code of Criminal Procedure, which governs arrests made without a warrant and incorporates the duties of a magistrate set forth in article 15.17(a).  *See* Tex. Code Crim. Proc. arts. 14.06(a), 15.17(a).  Given the similarity of the language used in these statutes—both require an arrestee to be brought before a magistrate "without unnecessary delay, but not later than 48 hours after the person is arrested"—this discrepancy does not impact our analysis.

in Article 15.17 of [the Code of Criminal Procedure,]" which include informing the accused in "clear language" of the accusation against him, of his rights to retain counsel, to remain silent, to have an attorney present during questioning, to terminate the interview at any time, to request the appointment of counsel, and to an examining trial. *Id.* art. 15.17(a). The magistrate shall also inform the person arrested that he is not required to make a statement and that any statement made by him may be used against him. *Id.*

What constitutes "unnecessary delay" in taking an arrestee before a magistrate depends on the facts of each case and varies with the circumstances. *Moya v. State*, 426 S.W.3d 259, 263 (Tex. App.—Texarkana 2013, no pet.); *Ontiveros v. State*, 890 S.W.2d 919, 929 (Tex. App.—El Paso 1994, no pet.); *Niehouse v. State*, 761 S.W.2d 491, 494 (Tex. App.— Dallas 1988, no pet.); *see Gilbert v. State*, 284 S.W.2d 906, 907 (Tex. Crim. App. 1955).

> The length of detention must be considered along with other matters such as accessibility of the magistrate, the facilities involved, the unavoidable administrative duties of the officers making the arrest, the intervention of a Sunday or holiday, the physical or mental condition of the person detained, a delay occasioned by the voluntary act of the accused freeing himself of the burden of guilt, and the time spent in further inquiry and investigation to corroborate the statements made by an accused.

*Niehouse*, 761 S.W.2d at 494; *accord Shea v. State*, No. 05-04-00685-CR, 2005 WL 1744936, at *1 (Tex. App.—Dallas July 26, 2005, no pet.) (mem. op., not designated for publication); *see Gilbert*, 284 S.W.2d at 907.

Concerning the delay in this case, the trial court made the following fact findings:

> Work was arrested at 12:02 AM on September 11, 2014 when she was placed in the "soft interview room" and told she was not free to leave. As previously found, CPPD officers began drafting applications for search warrants within two hours of Work's arrival at CPPD headquarters. Sometime before 5:00 AM on September 11th, officers of the Cedar Park Police Department (CPPD) presented

24

an affidavit to a Williamson County magistrate seeking issuance of a search warrant for Work's truck and cell phone. The affidavit alleged there was probable cause to believe Work had committed the offense of child endangerment. The warrant was signed at 5:01 AM, September 11, 2014.

Work was eventually taken before a Travis County magistrate at 3:26 am on September 14, 2014, roughly 75 hours after her arrest. . . .

The evidence demonstrates Work was not taken before a magistrate without unnecessary delay. Specifically, as demonstrated by the first search warrant application and warrant, there was a magistrate available. CPPD had the time and opportunity to prepare a probable cause affidavit for a search warrant and therefore could have easily prepared an application for an arrest warrant and taken Work before a magistrate at the same time. Therefore, the delay was not occasioned by reasonable investigative and processing procedures nor was it due to the search for the missing child.

The evidence demonstrates Work was not taken before a magistrate within 48 hours.

As previously found by the Court, the evidence demonstrates Work was not taken before a magistrate "of the county where the accused was arrested" (Williamson County).

The State failed to comply with Art. 15.17. This arrest was for a Class "C" misdemeanor, an offense which carries a maximum fine of $500 and no jail time. The period of the delay was unreasonable. The delay is particularly egregious after 48 hours have passed. . . .

Relying on these findings, appellant asserts that "unnecessary delay" occurred because she was taken into custody at 11:00 p.m. on September 10th but not taken before a magistrate until 3:26 a.m. on September 14th.[16] However, while the record supports some of the trial court's fact findings, it does not support the court's ultimate fact finding and resulting legal conclusion—or appellant's contention—that the police failed to comply with the statute requiring appellant to be taken before a magistrate "without unnecessary delay."

---

**16** Appellant asserts that she was taken into custody when she left the Cyprus Lane residence with officers at approximately 11:00 p.m., but that was not the trial court's finding nor was it this Court's conclusion in our previous opinion.

It is true that, as this Court previously held, appellant was arrested on September 11, 2014—at the point she was informed in the "soft interview" room that she was not free to leave (which was, as the trial court found, at approximately 12:02 a.m.)—for a Class C misdemeanor offense. *See* Tex. Penal Code § 37.081(b) (establishing that offense of false report regarding missing child is Class C misdemeanor). It is also true that appellant was taken before a magistrate "roughly 75 hours" after she was first arrested. However, the record demonstrates that appellant was not in custody for the misdemeanor offense for which she was arrested throughout that seventy-five-hour period.

The record demonstrates that appellant was arrested for the felony offense of abandoning a child when Detective Dailey informed her at 8:48 the morning of September 11th that she was going to be charged with child abandonment and she was already not free to leave. *See* Tex. Code Crim. Proc. art. 15.22 (explaining that person is arrested when he or she "has been actually placed under restraint or taken into custody"); *see also* Tex. Penal Code § 22.041(d)(2) (establishing that offense of abandoning child is third-degree felony "if the actor abandoned the child without intent to return for the child"). The record further demonstrates that appellant was formally arrested by Lieutenant Thomas at approximately 9:22 the night of September 11th for the felony offense of abandoning a child.

Moreover, the record reflects that when appellant was booked into the Williamson County Jail, she was charged only with the felony child-abandonment charge; she was not charged with the Class C misdemeanor of false report regarding missing child. Thus, the record reflects that, less than twenty-four hours after her initial Class C arrest, appellant was no longer in custody for the Class C offense. Thus, this offense was no longer a charge, or an "accusation against [her]," *see* Tex. Code Crim. Proc. art. 15.17(a), that required an appearance before a

26

magistrate in Williamson County. Furthermore, the record shows that when appellant left the Williamson County Jail at approximately 6:40 p.m. the following day, September 12th, the Williamson County child-abandonment charge had also been dropped. Thus, less than forty-eight hours after being arrested for the felony child-abandonment offense, this offense was no longer a charge, or "accusation against [her]," *see id.*, that required presentation before a magistrate in Williamson County.

Even if appellant remained in custody for the Class C offense after being booked into the jail on, and charged with, only the felony offense—which does not logically follow since she was not booked into the jail on, or charged with, the Class C offense—the record reflects that less than forty-eight hours after being taken into custody on Williamson County charges, *all* Williamson County charges had been disposed of. The record does not demonstrate that the investigating officers who arrested or had custody of appellant for either false report regarding a missing child or for abandoning a child failed to take appellant before a magistrate "not later than 48 hours after [appellant was] arrested," *see id.* art. 14.06(a), for either of those "accusation[s] against [her]," *see id.* art. 15.17(a).

Furthermore, the record demonstrates that appellant was arrested at the Williamson County Jail by Austin police officers for tampering with physical evidence at approximately 6:40 the evening of September 12th, was transported to Austin, and booked into the Travis County Jail at approximately 8:30 the night of September 12th. She appeared before the magistrate for the charge of tampering with physical evidence at 3:26 the morning of September 14th—approximately thirty-three hours after her arrest for that offense at the Williamson County Jail and thirty-one hours after being booked into the Travis County Jail for that offense. Thus, the record does not demonstrate that the investigating officers who arrested

27

or had custody of appellant for tampering with physical evidence failed to take appellant before a magistrate "not later than 48 hours after [appellant was] arrested," *see id.* arts. 14.06(a), 15.17(a), for that "accusation against [her]," *see id.* art. 15.17(a).

The record does not establish that appellant was arrested for or in custody for any offense more than forty-eight hours before being taken before a magistrate for that offense or before being released from custody for that offense, which eliminated the need to be brought before a magistrate since the "accusation against [her]" ceased to exist. Consequently, the trial court's fact finding that "[t]he evidence demonstrates Work was not taken before a magistrate within 48 hours" is not supported by the record.

Concerning the trial court's fact finding that the issuance of search warrants in the early morning hours of September 11th demonstrated the availability of a magistrate, the record supports the finding that, at the time the search warrant was signed, a magistrate was available. However, the availability of a magistrate does not necessarily render a delay in taking an arrestee before a magistrate "unnecessary." *See, e.g.*, *Jenkins v. State*, 912 S.W.2d 793, 807 (Tex. Crim. App. 1993) (holding that sixteen-hour delay was not unnecessary delay in taking defendant before magistrate even though magistrate was available during that sixteen-hour period). Magistrate availability is but one factor to consider. *See Gilbert*, 284 S.W.2d at 907; *Shea*, 2005 WL 1744936, at *1; *Niehouse*, 761 S.W.2d at 494.

Regarding the trial court's fact finding that the process of seeking and obtaining the search warrants demonstrated that the delay in taking appellant before a magistrate was not "occasioned by reasonable investigative . . . procedures nor was it due to the search for the missing child," the trial court appears to conflate the issue of magistrate availability with conducting an investigation. The record reflects that the search warrants were obtained after

28

appellant had told police that she had left C.T. alone in her truck, that C.T. had been taken from her truck, and that she did not report his kidnapping. Testimony from the officers at the suppression hearing—and the trial court made no findings that such testimony was not credible[17]—showed that police believed the truck to be a possible crime scene that might yield information helpful to locating C.T. Further, the testimony reflected that the search warrants were obtained in a coordinated police effort to find potential information about C.T.'s whereabouts. The trial court seems to suggest that the ongoing investigative efforts to find C.T. at the time the search warrants were issued were "unreasonable." However, at the time that CPPD obtained the search warrants, C.T. was still missing. "Investigation is not an unnecessary delay." *Gonzalez v. State*, — S.W.3d —, No. AP-77,066, 2020 WL 6482409, at \*27 (Tex. Crim. App. Nov. 4, 2020); *see Moya*, 426 S.W.3d at 263 (holding that continuing police investigation does not constitute "unnecessary delay" under article 15.17).

The record demonstrates that at the time the search warrants were sought and obtained, multiple police officers were exploring various sources of information, including interviewing appellant, Turner, and the Cypress Lane residents; attempting to locate appellant's friends and family or anyone with possible information; and following up on the limited information that appellant had provided. *See, e.g.*, *Gonzalez*, 2020 WL 6482409, at \*27 (concluding that delay in taking appellant to magistrate was not unnecessary "because investigation was ongoing after appellant's arrest" for capital murder; specifically, "in the

---

[17] We acknowledge that the trial court is the sole trier of fact at a suppression hearing and thus free to make credibility assessments of the witnesses. *See Ramirez-Tamayo v. State*, 537 S.W.3d 29, 35 (Tex. Crim. App. 2017); *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014); *see also Valtierra v. State*, 310 S.W.3d 442, 447 (Tex. Crim. App. 2010) ("The trial judge is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony.").

interim between appellant's arrest and appearance before magistrate, 'police were searching his house and truck, and [the detective] was interviewing appellant's wife and talking to other investigators'"). The officers tasked with seeking information, even by search warrant, were not the same officers who had arrested or who had custody of appellant. The fact that different officers obtained search warrants, which may have been part of an investigation of a crime that appellant had perpetrated, as the trial court found, does not negate the fact that there was an ongoing investigation into C.T.'s location and condition. Given the situation facing police at that time, we cannot conclude that the record supports a finding that investigative efforts to find a missing and possibly injured two-year-old child were "unreasonable."

Nevertheless, assuming without deciding that a delay that does not exceed the statutory limit of forty-eight hours can violate articles 14.06(a) and 15.17(a), and further assuming that the delay involved in appellant's appearance before a magistrate in this case was unnecessary and unreasonable, as the trial court found and concluded, the Court of Criminal Appeals has consistently held that the failure to bring an arrestee before a magistrate in a timely manner does not invalidate a confession absent proof of a causal connection between the delay and the confession. *Jones v. State*, 944 S.W.2d 642, 649 n.10 (Tex. Crim. App. 1996); *Cantu v. State*, 842 S.W.2d 667, 680 (Tex. Crim. App. 1992); *Self v. State*, 709 S.W.2d 662, 666–67 (Tex. Crim. App. 1986); *Waller v. State*, 648 S.W.2d 308, 311 (Tex. Crim. App. 1983); *Hester v. State*, 544 S.W.2d 129, 135 (Tex. Crim. App. 1976); *Schultz v. State*, 510 S.W.2d 940, 943 (Tex. Crim. App. 1974); *Easley v. State*, 448 S.W.2d 490, 492 (Tex. Crim. App. 1970); *Hughes v. State*, 409 S.W.2d 416, 417 (Tex. Crim. App. 1966); *Creswell v. State*, 387 S.W.2d 887, 890 (Tex. Crim. App. 1965); *Collins v. State*, 352 S.W.2d 841, 844 (Tex. Crim. App. 1961); *Golemon v. State*, 247 S.W.2d 119, 124 (Tex. Crim. App. 1952); *Dimery v. State*, 240 S.W.2d 293,

295 (Tex. Crim. App. 1951); *see Rocha v. State*, 16 S.W.3d 1, 29–30 (Tex. Crim. App. 2000) (Holland, J., concurring) (recognizing that Court of Criminal Appeals "has consistently held that violations of Art. 15.17 '[do] not automatically invalidate a confession' because the statute relates to the duties of the arresting officer and magistrate" (internal citation omitted)); *Williams v. State*, 692 S.W.2d 671, 675–76 (Tex. Crim. App. 1984) (observing that "[i]t is well established" that article 15.17 "relates to the duties of the arresting officer and the magistrate, and failure to comply with the statute does not automatically invalidate a confession").

Regarding a causal connection between the delay in taking appellant before a magistrate and the statements that she made to various investigating officers, the trial court found:

> As previously found by the Court, "[l]aw enforcement's purpose in holding Defendant in an *incognito* [the Court previously said "*incognito*" but intended to say "*incommunicado*"] status was to isolate her and make her available for repeated questioning to the benefit of their investigation." In short, the delay was to facilitate interrogation; CPPD and APD did interrogate Work and she answered. *Res ipsa loquitur* ("the thing speaks for itself"). The evidence thus demonstrates a causal connection between the delay and Work's statements.

The record does not support the trial court's fact findings that the purpose of law enforcement was to "isolate" appellant and keep her "incommunicado."

While the initial CPPD patrol officer explained that the reason for moving appellant from the Cypress Lane residence to the police station was to take her to "a more controlled area" to further the investigation, nothing suggests that the police decision to move from a residence at 10:00 at night to an interview room at the police station was intended to isolate appellant or render her unable to communicate with others. At that point, the record reflects, appellant was the primary source of information in police attempts to find a missing and

31

possibly injured young child. Admittedly, the record indicates, through comments that investigators made to appellant, that they kept her in the soft-interview room to facilitate the investigation—that is, so they could follow up with her about information gleaned during the course of their investigation. However, it would be expected that, as the principal source of information, appellant would be kept available during such a crucial time in the investigation. The testimony at the suppression hearing established that "when it comes to a missing child investigation," "time is of the essence" and it is important to have "resources available" to be utilized in recovery efforts. The record does not reflect that police actions making appellant—a critical source of information—available to assist with investigative efforts to recover C.T. were done with improper intent, as the trial court's findings suggest.

Further, the record does not reflect that appellant was held "incommunicado"—that is, that she was not able or not allowed to communicate with others. *See, e.g.*, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/incommunicado (defining "incommunicado" as "in a situation or state not allowing communication"); https://www.dictionary.com/browse/incommunicado (defining "incommunicado" as "deprived of any communication with others"). In fact, the record demonstrates that appellant had her cell phone with her in the soft-interview room.[18] In addition, the record shows that not only did appellant have access to her phone, she also spoke with CPS workers, medical personnel at both jails, and hospital personnel. Further, the record does not reflect that appellant, at any point,

---

[18] At the beginning of the interview with Detective Dailey, appellant explained to him that the officer who escorted her to the soft-interview room plugged her cell phone in "just in case it would work so that [she] could call anybody if [she] needed to." The detective reviewed the contact log in appellant's phone and, at one point, discussed making a recorded call to appellant's friend in Sachse, who was giving information to police that appellant disputed. Appellant's cell phone remained with appellant during the time she was in the soft-interview room.

asked to contact "outside" people but was denied the request. Nor does the record indicate that friends or family tried, at any time, to see appellant or speak with her but were prevented from doing so. While the evidence showed that appellant's communication was limited—as expected of a person in custody—it does not show that she was wholly deprived of communication with others.

Ultimately, the trial court found a causal connection based on a series of facts—that there was a delay in taking appellant before a magistrate, that "the delay was to facilitate interrogation," that interrogation occurred, and that appellant made statements during the interrogation—and the torts negligence doctrine of *res ipsa loquitur*. *See Res Ipsa Loquitur*, Black's Law Dictionary (11th ed. 2019) (defining "res ipsa loquitur" as "[t]he doctrine providing that, in some circumstances, the mere fact of an accident's occurrence raises an inference of negligence that establishes a prima facie case"). This legal doctrine has no applicability here. As we noted above, the Court of Criminal Appeals has specifically (and repeatedly) required proof that the delay in the failure to take an arrestee before a magistrate caused the statements to be made. *Jones*, 944 S.W.2d at 649 n.10; *Cantu*, 842 S.W.2d at 680; *Self*, 709 S.W.2d at 666–67; *Waller*, 648 S.W.2d at 311; *Hester*, 544 S.W.2d at 135; *Schultz*, 510 S.W.2d at 943; *Easley*, 448 S.W.2d at 492; *Hughes*, 409 S.W.2d at 417; *Creswell*, 387 S.W.2d at 890; *Collins*, 352 S.W.2d at 844; *Golemon*, 247 S.W.2d at 124; *Dimery*, 240 S.W.2d at 295. Moreover, the defendant bears the burden of establishing that causal connection. *Serrano v. State*, No. 03-14-00516-CR, 2015 WL 6835463, at *3 (Tex. App.—Austin Nov. 6, 2015, no pet.) (mem. op., not designated for publication); *Moya*, 426 S.W.3d at 262–64; *Weaver v. State*, 265 S.W.3d 523, 536 (Tex. App.—Houston [1st Dist.] 2008, pet. ref'd); *Fletcher v. State*, 960 S.W.2d 694, 701 (Tex. App.—Tyler 1997, no pet.); *State v. Vogel*, 852 S.W.2d 567, 570

33

(Tex. App.—Dallas 1992, pet. ref'd); *see Cantu*, 842 S.W.2d at 679; *Wagner v. State*, 687 S.W.2d 303, 307 (Tex. Crim. App. 1984).

The record here contains no evidence of a causal connection between the delay in bringing appellant before a magistrate and any of her statements to the various investigating officers. During the hearing on appellant's second amended motion to suppress, appellant acknowledged that her burden was "to show that [she] would have acted differently had she been magistrated [sic]." She then contended that a single reference to seeing a magistrate, together with two discussions about having an attorney, met that burden.[19] However, to suggest that asking about seeing a magistrate in that context—that is, seeking information about the potential upcoming process—is pure speculation. Appellant's question did not constitute evidence that appellant would not have talked to law-enforcement investigators if she had been given the opportunity to meet with a magistrate before (or during) the interviews. Appellant did not testify at the suppression hearing, and nothing in the video recordings of the various interviews or the testimony presented during the original suppression hearing established that appellant would have "acted differently had she been magistrated [sic]." *See, e.g.*, *Shadrick v. State*, 491 S.W.2d 681, 683–84 (Tex. Crim. App. 1973) ("The record is entirely silent of any evidence that [the] failure to take him before a magistrate caused appellant to confess."); *Dimery*, 240 S.W.2d at 295 ("In the instant case there is an absence of any testimony suggesting a causal

---

[19] The record reflects one brief mention of seeing a magistrate when Agent Gutierrez prepared appellant for the polygraph. Appellant asked him if, "after all of this," she was under arrest because "[the detective] said something earlier about child abandonment or something." At that point, the agent apologized to appellant for mistakenly telling her earlier in their interview that she was not under arrest. In the ensuing discussion, appellant asked if she would "just have to sit in jail until it's all resolved" and if she could "see a magistrate some way." Agent Gutierrez explained his role in the investigation, that of a fact finder, and said that he could not explain the process of the decision makers, which would depend on her cooperation and "how it would play out."

connection between the arrest and failure to take appellant before a magistrate and the making of the confession."). Thus, appellant failed to sustain her burden of presenting evidence to demonstrate a causal link between the delay at issue and her statements to the investigators. *See Cantu*, 842 S.W.2d at 680 (holding that defendant failed to show causal connection between failure to take him before magistrate and statements he gave to police); *Boyd v. State*, 811 S.W.2d 105, 124–25 (Tex. Crim. App. 1991) (concluding that appellant failed to demonstrate any causal connection between his statement and failure of authorities to take him before magistrate); *Shadrick*, 491 S.W.2d at 683–84 (concluding that no causal connection was shown in absence of evidence that failure to take appellant before magistrate caused him to confess, even with delay of ten or eleven days). The trial court abused its discretion in concluding otherwise.

Moreover, an unreasonable delay in presenting an arrestee before a magistrate will not vitiate an otherwise voluntary statement if the arrestee was properly advised of his (or her) *Miranda* rights.[20] *Cantu*, 842 S.W.2d at 680; *Boyd*, 811 S.W.2d at 125; *see Jones*, 944 S.W.2d at 650 n.10; *Von Byrd v. State,* 569 S.W.2d 883, 893 (Tex. Crim. App. 1978). In this case, appellant was given *Miranda* warnings and advised of her rights on five separate occasions and, each time, indicated that she understood her rights:

---

[20] We note that some decisions of the Court of Criminal Appeals indicate that the failure to timely take an arrestee before a magistrate does not invalidate a confession if the arrestee has been given proper warnings without stating the caveat that the confession is "otherwise voluntary." *See Curry v. State*, 910 S.W.2d 490, 496 (Tex. Crim. App. 1995); *Self v. State*, 709 S.W.2d 662, 667 (Tex. Crim. App. 1986); *Von Byrd v. State*, 569 S.W.2d 883, 893 (Tex. Crim. App. 1978); *Easley v. State*, 454 S.W.2d 758, 760–61 (Tex. Crim. App. 1970). We cite to cases indicating that the delay in bringing an arrestee before a magistrate will not invalidate an "otherwise voluntary" statement because appellant asserts in her first point of error that her statements to the investigating officers were involuntary and challenges the trial court's fact findings and legal conclusions to the contrary.

- She was first read *Miranda* warnings and advised of her rights by Detective Dailey when he initially met with her in the soft-interview room at the Cedar Park police station before he began interviewing her. Appellant communicated that she understood her rights, by nodding her head or orally indicating such, and agreed to talk with the detective.

- Appellant was next given *Miranda* warnings when she was again advised of her rights by Detective Dailey when Lieutenant Thomas joined the interview approximately five hours later. Appellant orally confirmed that she understood her rights and expressed that she wanted to talk with the detectives.

- Appellant was given *Miranda* warnings the third time by Agent Gutierrez when she met with him in the suspect-interrogation room. She conveyed her understanding of her rights by signing the *Miranda* form. She then agreed to talk with the agent.

- She was given *Miranda* warnings the fourth time by Detective Nelson when he met with appellant at the Williamson County Jail. She orally affirmed that she understood her rights and agreed to talk with the detectives.

- Finally, appellant was given *Miranda* warnings again by Detective Nelson when he interviewed her at the Austin police station. She again orally communicated that she understood her rights and agreed to talk with the detectives.

Given that the record contains evidence that appellant was properly admonished of her *Miranda* rights prior to giving her statements, the issue then is whether appellant's statements were "otherwise voluntary."

***Voluntariness of Statements***

The Fifth Amendment privilege against self-incrimination prohibits the government from compelling a criminal suspect to bear witness against himself. *Pecina v. State*, 361 S.W.3d 68, 74–75 (Tex. Crim. App. 2012); *see* U.S. Const. amend. V (stating that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself"). "The Fifth Amendment right against self-incrimination is satisfied only when a defendant's statements are given voluntarily." *Vasquez v. State*, 411 S.W.3d 918, 919 (Tex. Crim. App. 2013); *see* Tex. Code Crim. Proc. art. 38.21 (providing that statements "freely and voluntarily made without

compulsion or persuasion" are admissible). A defendant may claim that her statement was involuntary and thus inadmissible under three different theories: (1) that it was made in violation of the Due Process Clause; (2) that it does not comply with the dictates of *Miranda*, as expanded in Article 38.22, sections 2 and 3; and (3) that it was involuntary under Article 38.22, section 6 of the Code of Criminal Procedure—also known as "general involuntariness." *Oursbourn*, 259 S.W.3d 159, 169 (Tex. Crim. App. 2008); *Wolfe v. State*, 917 S.W.2d 270, 282 (Tex. Crim. App. 1996).

A statement is obtained in violation of constitutional due process—and therefore "involuntary"—only if the statement is causally related to objectively coercive government misconduct of such a nature that any statement made was unlikely to have been the product of an essentially free and unconstrained choice. *Contreras v. State*, 312 S.W.3d 566, 574 (Tex. Crim. App. 2010); *Alvarado v. State*, 912 S.W.2d 199, 211 (Tex. Crim. App. 1995); *see Colorado v. Connelly*, 479 U.S. 157, 163–64 (1986); *Oursbourn*, 259 S.W.3d at 169–71; *see also Lopez v. State*, — S.W.3d —, No. PD-0956-19, 2020 WL 6479197, at *6 (Tex. Crim. App. Nov. 4, 2020) (explaining that to prevail on due-process "involuntary confession" claim, "a defendant must show (1) that police engaged in activity that was objectively coercive, (2) that the statement is causally related to the coercive government misconduct, and (3) that the coercion overbore the defendant's will"); *Contreras*, 312 S.W.3d at 574 (explaining that coercive government misconduct renders statement involuntary if defendant's "will has been overborne and his capacity for self-determination critically impaired" (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 225 (1973))).

Regarding the dictates of *Miranda* and article 38.22, the Court of Criminal Appeals has held that "[t]here are two facets to any inquiry" regarding the adequacy of a waiver of an accused's *Miranda* rights:

> First, the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second the waiver must be made "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."

*Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011) (quoting *Ripkowski v. State*, 61 S.W.3d 378, 384 (Tex. Crim. App. 2001)). For a waiver of a *Miranda* right to be involuntary "there must be some element of official intimidation, coercion, or deception." *Id.* (citing *Connelly*, 479 U.S. at 169–70; *Oursbourn*, 259 S.W.3d at 170). However, a claim that a waiver of the article 38.22 statutory rights is involuntary "need not be predicated on police overreaching." *Leza*, 351 S.W.3d at 352 (quoting *Oursbourn*, 259 S.W.3d at 172). Such a claim of involuntariness can involve police overreaching but can also involve inquiries into the accused's state of mind that are not relevant to due process claims. *Oursbourn*, 259 S.W.3d at 172; *see Leza*, 351 S.W.3d at 352 ("Circumstances unattributable to the police that nevertheless adversely impact an accused's ability to resist reasonable police entreaties to waive his statutory rights . . . are 'factors' in the voluntariness inquiry, though they 'are usually not enough, by themselves, to render a statement inadmissible under Article 38.22.'" (quoting *Oursbourn*, 259 S.W.3d at 173)).

Likewise, claims of "general involuntariness" "can be, but need not be, predicated on police overreaching." *Lopez*, 2020 WL 6479197, at *7 (quoting *Oursbourn*, 259 S.W.3d at 172). Such claims can involve "'sweeping inquiries into the state of mind of a criminal defendant who has confessed' . . . that are not of themselves relevant to due process claims." *Id.*

38

(quoting *Oursbourn*, 259 S.W.3d at 172). "This is because Section 6 [of article 38.22] protects suspects from themselves" rather than from law-enforcement officials. *Id.*; *see Oursbourn*, 259 S.W.3d at 172 ("But Section 6 of that article may also be construed as protecting people from themselves because the focus is upon whether the defendant voluntarily made the statement. Period.").

The determination as to whether a statement was voluntarily made must be analyzed by examining the totality of the circumstances. *Arizona v. Fulminante,* 499 U.S. 279, 285–86 (1991); *Delao v. State,* 235 S.W.3d 235, 239 (Tex. Crim. App. 2007); *see Lopez,* 2020 WL 6479197, at *6 (observing that "involuntariness" of statement "is reviewed under the Due Process Clause and articles 38.21 and 38.22 by examining the totality of the circumstances surrounding the [statement]"); *Joseph v. State*, 309 S.W.3d 20, 25 (Tex. Crim. App. 2010) (explaining that evaluation of whether appellant knowingly, intelligently, and voluntarily waived *Miranda* rights before giving statement utilizes "[t]he 'totality-of-the-circumstances approach' [that] requires the consideration of 'all the circumstances surrounding the interrogation,' including the defendant's experience, background, and conduct" (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979))).

Relevant factors to consider when determining whether a statement is voluntary include, but are not limited to: whether the defendant was advised of his constitutional rights (given *Miranda* warnings or statutory warnings); the defendant's age, intelligence level, and education; the conditions under which the defendant was questioned—i.e., length of detention, duration of questioning, environment, and access to restroom facilities and food; physical or mental impairment of the defendant, such as intoxication, illness, the influence of medication or drugs, and mental impairment or other disabilities; and whether physical punishment for

the failure to provide a statement, such as the deprivation of food or sleep, was used. *Watts v. State*, No. 03-12-00480-CR, 2013 WL 4516187, at *2 (Tex. App.—Austin Aug. 20, 2013, no pet.) (mem. op., not designated for publication); *see Schneckloth*, 412 U.S. at 226; *Lopez*, 2020 WL 6479197, at *7; *Oursbourn,* 259 S.W.3d at 172–73.

Concerning the voluntariness of appellant's statements, the trial court made the following fact findings, which the court stated were "indicative of the lack of a free, knowing and voluntary relinquishment of her *Miranda* rights":

> Work was young (20 years of age), homeless[,] and pregnant. She was about four months into a high[-]risk pregnancy for which she was under a physician's care. She was intermittently ill during the questioning. The police became aware of her pregnancy and complications but did not provide medical attention for the pregnancy complications for several days. She was not afforded access to her medication. . . .
>
> Work was held *incommunicado* for a significant period of time.
>
> The room in which she was confined for the first 26 hours had no provisions for sleeping, no restroom and no ability to turn out the lights.
>
> She was under constant armed surveillance.
>
> She was awakened in the middle of the night for questioning.
>
> During the first 26 hours of questioning, she was provided with no food other than one taco (hardly appropriate for a person suffering from pregnancy complications).
>
> The offense for which she was under arrest and held was a misdemeanor punishable by a fine only.
>
> The police told her she was not under arrest.
>
> The police falsely informed her they were authorized to take a buccal swab.
>
> Work was questioned by multiple officers over the span of three days.
>
> On several occasions, Work inquired about an attorney or about seeing a judge. When she first asked about an attorney, the officer informed her that obtaining an attorney was her responsibility, a false statement which ignored the fact that an

40

attorney would be appointed for her due to her obvious indigency. A subsequent inquiry by Work was met with the response "Let's put that aside for now."

The trial court made additional fact findings, which the court stated "tend[ed] to support a finding that the statements made by [appellant] were voluntary":

During the initial consensual encounter at her temporary residence, Work answered questions asked by the police without hesitation.

Work was advised of her *Miranda* rights five times during four days of questioning by three different law enforcement agencies. After each warning she again answered questions without hesitation.

Work's inquiries regarding the assistance of counsel and being taken before a magistrate were not unequivocal assertions of her right to counsel or her right to remain silent.

There is no evidence of threats or inducements. There is no evidence that she was under the influence of alcohol or drugs during questioning. There is no evidence that she lacked mental capacity or suffered from any mental illness.

The evidence strongly suggests that Work voluntarily answered questions in furtherance of her attempts to perpetrate her false narrative concerning her son's disappearance.

Relying on the trial court's fact findings indicative of involuntariness but challenging the court's fact findings supporting voluntariness, appellant contends that law enforcement "failed to adequately address [her] personal and medical needs" during the interviews; "continually lied and misinformed [her]" during the interviews, which resulted in her "confusion and lack of comprehension regarding her legal rights"; and delayed taking her to a magistrate "for almost 75 hours" after arresting her without a warrant for a Class C misdemeanor and, during that time, she was "unable to make outside contact and [was] continually kept under guard." These factors, she claims, rendered her statements involuntary.

41

A review of the record demonstrates that some, but not all, of the trial court's fact findings that the court characterized as indicative of involuntariness are supported by the record. Moreover, in some instances those findings supported by the record do not accurately present the record. The fact findings that the court characterized as indicative of voluntariness are, for the most part, supported by the record, although, again, some of those findings with record support do not accurately present the record.[21]

While the record reflects that appellant was twenty years old, the record does not reflect that appellant was immature or inexperienced. The record reflects that she was educated through the eleventh grade and then obtained her G.E.D. She participated throughout the interviews, answering questions appropriately and occasionally asking questions of her own. Her answers followed logically from the flow of the interviews. She was articulate and was able

---

[21] Generally, reviewing courts "should apply a deferential review to a trial court's determination of historical facts, even when the evidence on which that determination is based includes an electronic recording." *Baiza v. State*, 502 S.W.3d 801, 802 (Tex. Crim. App. 2016). However, although reviewing courts "must defer to the trial judge's factual finding on whether a witness actually saw what was depicted on a videotape or heard what was said during a recorded conversation," appellate courts "may review *de novo* 'indisputable visual evidence' contained in a videotape." *State v. Duran*, 396 S.W.3d 563, 570–71 (Tex. Crim. App. 2013) (internal citation omitted); *see Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000) (observing that "the nature of the evidence presented in the videotape does not pivot 'on an evaluation of credibility and demeanor'"). As Judge Price once explained:

> The main reason [reviewing courts] defer to a trial judge's findings is that [the judge] is in a better position to determine credibility . . . by seeing and hearing a witness testify. We often say that because we have only a cold record, reviewing courts do not have the best vantage point from which to make factual determinations.

*Hall v. State*, 160 S.W.3d 24, 40 (Tex. Crim. App. 2004) (Price, J., concurring). Here, we are not reviewing the trial court's fact findings based on a review of simply a "cold record." Rather, we are watching the same video recordings of the various interviews that the trial judge watched. The trial judge was not in an appreciably better position to review the evidence of the police conduct or appellant's behavior. *See Carmouche*, 10 S.W.3d 331–32 (recognizing that electronic recording may speak for itself).

to easily and effectively communicate with the investigators. In fact, throughout the interviews, appellant demonstrated a high level of sophistication. Nothing in the record indicates that appellant's age rendered, or contributed to rendering, her statements involuntary.

Although the record establishes that appellant was four months pregnant with a high-risk pregnancy at the time of her interviews, the basis for that status is unclear, though the record reflects that appellant was "borderline diabetic" and that she had been diagnosed with GERD (heartburn) and hyperemesis gravidarum ("a lot" of nausea and vomiting during pregnancy). However, while the record shows that she suffered with nausea "during questioning," she did not actually vomit in the presence of any of the investigators, or any other officers, or while being questioned by any of them. The record does not reflect that her pregnancy symptoms adversely impacted her ability to participate in the interviews. Moreover, appellant was repeatedly asked how she was doing and how she was feeling, and, while she described various pregnancy symptoms, she repeatedly told law enforcement that she was "okay." She did, at one point, indicate that she was cramping, but when Agent Gutierrez sought to clarify her condition, she explained that she "cramped all the time." Furthermore, when he explicitly asked if she needed medical assistance, she declined, saying that she was "okay." Appellant did not at any time request medical attention or ask to discontinue questioning because she was not feeling well.

Further, the record does not reflect, as the trial court's findings suggest and appellant seems to contend, that appellant was deprived of medical attention for "pregnancy complications for several days." After repeatedly asserting that she was "okay" throughout the interviews and declining the offer of medical attention, appellant was taken to see medical personnel shortly after being booked into the Williamson County Jail. At that time, she reported

43

that she was not "currently experiencing pain," and the evaluation established that she was demonstrating "no acute distress." She remained in the infirmary throughout her stay in that jail. Although she was not given medication for nausea while at the Williamson County Jail, the record does not show that appellant "was not afforded access to her medication." Rather, the record shows that promethazine, the medication prescribed to appellant for nausea and vomiting, is "an as-needed medication" that would have been given "only if she had asked." Also, while no blood-sugar checks were done because "she had no complaints as far as any blood sugar related issues," appellant was given insulin to take with her when she left the jail. In addition, on being booked into the Travis County Jail, appellant was taken to the jail nurse who, after consulting with the on-call physician, recommended that appellant be taken to the hospital. Appellant was immediately transported to the hospital where she received treatment (fluids) to address her dehydration and ketoacidosis (the high ketone levels that resulted from dehydration) and was given medicine for nausea and vomiting.

Contrary to appellant's contention and the trial court's suggestion, nothing in the record shows that appellant was, at any time, deprived of needed medical attention. She did not request medical assistance during the interviews and, on one occasion, declined medical assistance when it was offered. She was housed in the infirmary at the Williamson County Jail; the record does not indicate that she made any medical complaints—related to her pregnancy or diabetes or otherwise—that were not addressed. Further, appellant received medical attention at the Travis County Jail, which included transportation to the hospital for treatment when her condition warranted such care.

Moreover, appellant's medical expert (a VA nurse who reviewed appellant's medical records) testified at the suppression hearing that, while mental acuity can be affected by

44

dehydration, those issues, such as "confusion," occur if a person's mean arterial blood pressure (MAP) is below 60, and appellant did not exhibit those levels. The nurse opined that hyperemesis gravidarum can be "a serious issue" and even life threatening "when you're vomiting all the time," but the record does not demonstrate that appellant's condition reached that level of severity. The nurse's testimony indicated that continuous vomiting would result in someone being "not coherent" and "not carrying on an intelligent conversion." While appellant suffered nausea and several bouts of vomiting, the record demonstrates that she remained coherent throughout her interactions with law enforcement. Furthermore, while her difficulty eating and drinking resulted in dehydration and ketoacidosis, the nurse confirmed that someone experiencing ketoacidosis "can still carry on a conversation" and "can make a conscious decision," and that that condition would not prevent someone from understanding the situation or what was happening. The record does not support appellant's contention that her medical issues, even at the point that they required medical attention (which was then provided), rendered her statements involuntary.

We have already determined that the trial court's fact finding that appellant was held "incommunicado" is not supported by the record, and we do not repeat that discussion here except to note that while appellant was alone "for a significant period of time" when officers left the interview rooms, they did so in order to follow up on information that she provided in their efforts to find C.T. As for appellant's contention that she was "unable" to "make a call of her own," we again note that the record reflects that appellant's cell phone was in the soft-interview room with her. Also, her contention that she was "unable to make outside contact" is refuted by the evidence demonstrating that she had contact with CPS workers, medical personnel at both jails, and hospital personnel as well as by the lack of evidence showing that she was, at any time,

45

denied a request to contact friends or family or that such individuals were prevented from seeing or speaking with appellant.

While the trial court's fact finding that the soft-interview room "had no provisions for sleeping" is supported by the record to the extent that the room did not have a bed, the record reflects that the room had a loveseat and that appellant slept on it on several occasions. Also, while the room did not have a restroom, appellant was repeatedly asked if she needed to use the restroom and was taken when she responded affirmatively as well as any time that she asked to go to the restroom. Furthermore, while the lights remained on in the soft-interview room while appellant was in it, no evidence in the record demonstrated that there was "no ability to turn out the lights."

The trial court's fact finding that appellant "was awakened in the middle of the night for questioning" is supported by the record, but we note that on the occasion that she was awakened during the first night that she was in custody, officers sought to question appellant further about information obtained during their follow-up efforts in attempting to locate C.T. The record does not reflect that waking up appellant was based on any intent to deprive her of sleep. Notwithstanding the perhaps less-than-ideal sleeping accommodations, and given the situation and circumstances, nothing in the record demonstrates that appellant was deprived of sleep. In fact, upon being asked, appellant reported several times to officers that she had slept.

Regarding the trial court's fact finding that appellant "was under constant armed surveillance" and appellant's contention that she was "continually kept under guard," we simply note, as we concluded in our pretrial opinion, that appellant was in custody. She was being monitored while in the soft-interview room but did not have an armed officer present in the room with her at all times. She was in the presence of armed officers only when those officers were

46

investigators interviewing her or when officers were transporting her. Further, appellant was, on repeated occasions, left alone in both interview rooms. Also, nothing in the record suggests that appellant was under "armed surveillance" during the times that she was housed at either the Williamson County Jail or the Travis County Jail. The record demonstrates that appellant was under suicide watch at both jails, due to the nature of the charges and the publicity involved, but such monitoring was done outside the cell. The trial court and appellant seem to equate, or at least conflate, simply being in custody with being under armed guard.

The record does not support the trial court's fact finding that during the first twenty-six hours of questioning, appellant "was provided with no food other than one taco." Though the record reflects that appellant was provided a breakfast taco, which she did not eat, the record shows that, also during that time frame, she was provided pizza, of which she only ate a few bites, and an energy bar. More importantly, the record demonstrates that appellant was asked numerous times throughout that period of questioning if she was hungry and if she wanted something to eat, and she repeatedly declined the offers of food. The record does not reflect that appellant was deprived of nourishment as the trial court's fact finding (and comment) suggests.

Furthermore, the record refutes appellant's similar contention that during the three days that she was interrogated, she was "provided with very little food" consisting of only the taco, pizza, and energy bar. In addition to the repeated offers of food and the food provided that we described above, the record reflects that a "pregnancy diet" was ordered for appellant in the Williamson County Jail, and nothing shows that she was not provided meals consistent with that order during her stay in that jail.[22] In fact, the record reflects that she was given lunch on

---

[22] The medical sergeant from the Williamson County Jail testified about the times that meals were provided in the jail and explained that if an inmate missed a meal because he was not

47

September 12th along with a prenatal vitamin. Nor does the record indicate that appellant was denied meals while in the Travis County Jail on September 13th. Appellant's medical expert opined that appellant was "eating correctly" while at that jail. Additionally, the record shows that at the beginning of her interview with APD detectives that afternoon, Detective Nelson provided appellant a snack (pretzels and a drink). She was also provided an additional snack (more pretzels) at the end of that interview before she was returned to the jail. Overall, nothing in the record shows that appellant was deprived of nourishment.

The trial court's fact finding that "[t]he offense for which she was under arrest and held was a misdemeanor punishable by a fine only" is supported by the record but is only accurate in part. As discussed previously, while appellant was arrested for the Class C misdemeanor offense of false report regarding a missing child, the record reflects that she was "held" for that offense (or for that offense alone) for less than twenty-four hours. She was then "held" on the felony child-abandonment offense and then "held" on the felony tampering-with-physical-evidence offense. As also discussed previously, the record refutes any statutory violation based on appellant's contention that she was "held in custody for almost 75 hours without being taken to a magistrate after being arrested without a warrant for a class C misdemeanor" as the record demonstrates that appellant was not held for more than forty-eight hours after being arrested for any offense.

The trial court's fact finding that the "police told [appellant] she was not under arrest" is true with respect to Detective Dailey's initial comment, which was immediately followed by his statement informing her that she was not free to leave, and Agent Gutierrez's

in his cell, the meal would be held or, in the alternative, the inmate would be provided a sack lunch with a sandwich and a fruit.

48

initial mistaken comment to appellant, which he later corrected with an apology explaining that he was unaware of all the circumstances. However, the record demonstrates that Detective Dailey informed appellant on the morning of September 11th that she was going to be charged with child-abandonment. In addition, when Lieutenant Thomas formally arrested appellant for abandoning or endangering a child that night, he told her that she was under arrest for that offense. Likewise, when APD officers picked appellant up from the Williamson County Jail to transport her to Austin, they arrested her for tampering with physical evidence and told her that she was under arrest for that offense. Further, contrary to appellant's assertion, the record does not show that appellant asked "repeatedly" whether she was under arrest. Rather, the record reflects that she asked that question one time of Agent Gutierrez. The FBI agent, who was not present when Detective Dailey told appellant that she was not free to leave or when he told her that she would be charged with child-abandonment, explained the various law-enforcement roles and that the arrest decision would be made by others and, thus, told appellant that he did not know. Given the evolving nature of the investigation, the involvement of multiple law-enforcement agencies, and the various offenses and arrests, the record does not support appellant's contention that law enforcement "lied" to her, "misinformed" her, or "withheld" information from her about her custody status.

The record demonstrates that CPPD obtained a DNA sample from appellant by buccal swab when she was in the soft-interview room. The trial court found that "[t]he police falsely informed her they were authorized to take a buccal swab." However, the record demonstrates that during his interview with appellant, Agent Gutierrez told appellant, "One of the things that we need to do here is . . . they have to take a swab of your mouth for DNA," and appellant responded, "Okay." A few minutes later, Lieutenant Thomas entered the room and

asked the FBI agent if he had "asked her about the swab," and Agent Gutierrez said, "Yeah." Lieutenant Thomas then thanked appellant and told her they "appreciate[d] it." When appellant asked "[w]hat's it for exactly," the detective explained that "[i]t's evidence gathering, just standard procedure, for the most part" and again expressed his appreciation to her. Appellant then asked the uniformed officer taking the swab if "this is something that everybody does." The officer told appellant that "[i]t's just part of the procedure that we do for evidence purposes." The record suggests that the officers perhaps miscommunicated about obtaining appellant's consent to take the DNA sample and reflects that law-enforcement officers conveyed to appellant that obtaining her DNA sample was a standard part of evidence gathering. It does not, however, show that anyone "falsely informed her they were authorized to take a buccal swab."

The trial court's fact finding that "Work was questioned by multiple officers over the span of three days" is supported by the record. However, the record demonstrates that the questioning was not continuous and included multiple breaks, some spanning hours, when she was left alone in the soft-interview room and the suspect-interrogation room as well as the periods during which she was at the jails. Furthermore, we note that the record reflects that the search for missing C.T. was a massive law-enforcement effort involving numerous officers and multiple law-enforcement agencies, including local police, local sheriff's deputies, the FBI, and the state police. As the information evolved, additional officers became involved in the investigation and, consequently, the questioning.

Finally, the record supports only part of the trial court's fact findings—and appellant's contentions—as to appellant asking about getting an attorney or seeing a judge. The first mention of an attorney happened about forty-five minutes into the initial interview with Detective Dailey. The detective explained to appellant that they were doing what they could to

try to find C.T. and asked her if she had any questions for him. She said, "No," but then asked him, "If I ask for a lawyer . . . would he come here tonight and sit here with us . . . how does that work?" Detective Dailey asked her if she wanted a lawyer, and she said that she did not know. She complained that she did not know what was going on, and the detective explained that they were trying to find C.T. He then told her, "[I]f you want to talk to an attorney, that's something that you're going to have to initiate and find an attorney to call, but if that's what you want to do, you need to let me know." Appellant then asked, "Well, didn't you say something like I could get a court appointed one?" The detective confirmed, saying, "Right." Appellant then asked, "And I can do that tonight or I would have to go to jail and wait?" At that point, the detective's phone rang, and he left the room. When he returned, Detective Dailey explicitly asked appellant if she was asking for an attorney. She responded that she did not know. The trial court found that the detective falsely informed appellant that obtaining an attorney was her responsibility. However, the substance of appellant's questioning was if she could have a lawyer with her at that moment (that is, that night), and the information given to her was correct. Taken in context, the detective's comments, while perhaps poorly phrased, indicated that an appointed attorney would not be available to be with her in the interview room at that time but that she could contact an attorney (retained) to be present. We cannot concluded that this information was "false." More importantly, the detective asked appellant several times if she wanted a lawyer or was asking for one and correctly conveyed that if she wanted one, she needed to let him know. She did not.

The second time appellant mentioned a lawyer was during the interview with Agent Gutierrez when he asked her if she would agree to a polygraph. Appellant gave a hesitant and equivocal response, and Agent Gutierrez sought to clarify her response and asked her what questions he could answer for her. She then expressed that she did not know if she "need[ed] to

51

try to talk to a lawyer or what." In context, the comment indicated that appellant was unsure if she needed to consult a lawyer before taking a polygraph. The agent responded, "Tell you what. We can talk about this here in a little bit — this aspect" as he set aside the polygraph paperwork. In his testimony at the suppression hearing, Agent Gutierrez explained that he understood appellant's comment to be "rhetorical" or an "equivocation," and clarified that the matter he was setting aside was the polygraph. The trial court did not make a finding that the agent was not credible in this testimony. Furthermore, the video of that exchange does not support the trial court's finding that appellant made an "inquiry" about getting a lawyer or that the FBI agent responded with a comment to set aside that inquiry.

The only reference to "seeing a judge" was when appellant sought information from Agent Gutierrez about what would happen to her until the situation was "all resolved." She asked if she would "just have to sit in jail until it's all resolved" and if she could "see a magistrate some way." She did not, as the trial court's finding suggests, ask to see a judge and have that request ignored or denied. Rather, appellant asked about the process—that is, what would happen to her during the course of the investigation while law-enforcement officers looked for her son—and Agent Gutierrez's response conveyed that, given the evolving situation, he did not know.

Further, the record does not support appellant's contention that she was confused or did not understand her legal rights. The portions of the record that appellant cites, including those just discussed concerning getting an attorney and seeing a magistrate as well as a question about possibly bonding out, do not demonstrate "confusion" or a "lack of comprehension." Rather, they reflect questions about the process and uncertainty about what would happen to her given the situation. Appellant did not testify at the suppression hearing nor provide any other

52

evidence showing that she was confused by what law-enforcement officers told her or that she did not understand her rights. In fact, the evidence showed her repeated confirmation, in response to the numerous *Miranda* warnings given, that she understood her rights.

Concerning appellant's challenge to the trial court's fact findings that supported the voluntariness of her statements, we note that the entirety of the record demonstrates that appellant answered questions—throughout the questioning at the Cypress Lane residence, at the Cedar Park police station, at the Williamson County Jail, at the Austin police station, and during the various transports between locations—"without hesitation" as the trial court found. Further, as we previously noted, the record demonstrates that appellant was given *Miranda* warnings on five separate occasions and that, each time, she indicated that she understood her rights. As just discussed, the record does not support appellant's assertions to the contrary—that she was confused about or did not comprehend her rights. Also, as our earlier discussion about the trial court's fact findings concerning appellant's "inquiries" about an attorney or magistrate shows, appellant made no unequivocal assertion of her right to counsel. Moreover, the record reflects that appellant did not, at any time, invoke her right to remain silent. Nor did she, at any time, seek to terminate the interview. Also, the record supports the trial court's findings that no evidence in the record demonstrates any threat or inducement by law enforcement, shows that appellant was under the influence of alcohol or drugs during any of the questioning, or indicates that appellant lacked mental capacity or suffered from any mental illness.

Ultimately, the trial court concluded: "Work was properly warned of her *Miranda* rights on five occasions. Despite multiple factors to the contrary, after careful consideration of the totality of the circumstances, the Court concludes Work's statements were voluntary." Reviewing the record and considering the relevant factors, we agree with the trial

court's conclusion that, based on the totality of the circumstances, appellant's statements to the various investigators were voluntarily made.

In sum, even if appellant—who was not arrested for and then held on any charge for more than forty-eight hours before being released on the charge or being taken before a magistrate—was not taken before a magistrate "without unnecessary delay" in violation of article 14.06, the record contains no evidence establishing a causal connection between the delay in taking appellant before a magistrate and her statements to investigating officers. Moreover, the record demonstrates that appellant was properly given her *Miranda* warnings on five separate occasions prior to making statements to various investigators and reflects that appellant's statements were voluntarily made. Accordingly, we overrule appellant's first and second points of error.

### *Release on Bond*

Appellant also contends that her statements should have been suppressed because she was denied the opportunity to be released on a personal bond as required by article 17.033(a) of the Code of Criminal Procedure, which provides that

> a person who is arrested without a warrant and who is detained in jail must be released on bond, in an amount not to exceed $5,000, not later than the 24th hour after the person's arrest if the person was arrested for a misdemeanor and a magistrate has not determined whether probable cause exists to believe that the person committed the offense. If the person is unable to obtain a surety for the bond or unable to deposit money in the amount of the bond, the person must be released on personal bond.

Tex. Code Crim. Proc. art. 17.033(a).

Although the trial court commented during the hearing on appellant's second amended motion to suppress that the "ordinary course of procedure" in Travis County was for

54

the magistrate setting the bond on a Class C misdemeanor to release the arrested defendant "on their own recognizance" after setting the bond, appellant made no assertions that the failure to comply with article 17.033(a) required suppression of her statements—in either her second amended motion to suppress or at the hearing on that motion. Further, the trial court made no fact findings related to article 17.033(a) or appellant's inability to obtain release under that statute; nor did the trial court render any conclusions about the purported violation of the statute or resolve the suppression issue on that basis.

Assuming without deciding that this complaint has been preserved for appellate review, *see* Tex. R. App. P. 33.1(a), the record reflects, as we have already observed, that appellant was released from custody on the Class C misdemeanor offense less than twenty-fours after her arrest for that offense when she was not booked into the jail on that offense. Moreover, the record demonstrates that less than nine hours after her arrest for the Class C offense, appellant was also arrested for the felony child-abandonment offense when, at 8:38 the morning of September 11th, Detective Dailey informed her that she would be charged with child abandonment, and she was already not free to leave. Thus, within the twenty-four-hour period initiated by her Class C arrest, appellant was in custody on a felony offense. Thus, article 17.033(a) was inapplicable to appellant's situation. We overrule appellant's third point of error.

### Fourth Amendment Claim

Finally, citing to *Gerstein v. Pugh*, 420 U.S. 103, 117 (1975), appellant argues—as she did in her second amended motion to suppress and at the hearing on that motion—that her "prolonged detention" without being taken before a magistrate violated the Fourth Amendment of the United States Constitution because she was denied the right to receive the protection of a

judicial probable-cause determination meant to be provided by a neutral magistrate. She maintains that "[t]he point of Article 15.17 is the same as that of the Fourth Amendment to the United States Constitution. To provide the protection of neutral magistrate." Concerning this purported Fourth Amendment violation, the trial court concluded that "the Texas rule that 'delay in bringing an arrestee before a magistrate will not invalidate an otherwise voluntary confession if the arrestee was properly advised of his *Miranda* rights prior to making the statement' comports with the requirements of the Fourth Amendment."

"Under *Gerstein,* warrantless arrests are permitted but persons arrested without a warrant must promptly be brought before a neutral magistrate for a judicial determination of probable cause." *County of Riverside v. McLaughlin*, 500 U.S. 44, 53 (1991) (citing *Gerstein*, 420 U.S. at 114); *see Sorto v. State*, 173 S.W.3d 469, 486 (Tex. Crim. App. 2005) (recognizing "Fourth Amendment requirement that a person arrested without warrant be given a 'prompt' judicial determination of probable cause to permit further detention"). However, the purpose of article 15.17 "is to comply with constitutional and statutory requirements that an accused person be promptly and fully informed of the accusation against him, as well as his legal rights, including his *Miranda* rights and his right to reasonable bail." *Sorto*, 173 S.W.3d at 486; *see McGee v. Estelle*, 625 F.2d 1206, 1209 (5th Cir. 1980). "Articles 14.06 and 15.17 concern only the presentment of an accused before a magistrate in order to apprise the accused of his various rights. . . . [N]owhere in these Code provisions is a requirement that a probable cause [determination] be made promptly, or at all." *Cantu*, 842 S.W.2d at 680 n.10.

Appellant's argument conflates the duties of a magistrate under article 15.17 with the judicial probable-cause determination by a magistrate required by the Fourth Amendment. Given this distinction, we cannot conclude that the delay in taking appellant before a magistrate

56

violated appellant's Fourth Amendment right to a probable-cause determination by a magistrate. Nor can we conclude that the trial court abused its discretion by concluding that Texas law regarding a delay in taking an arrestee before a magistrate—that such a delay will not vitiate an otherwise voluntary statement if the arrestee was properly advised of his rights before making the statement—"comports with the requirements of the Fourth Amendment." We overrule appellant's fourth point of error.

## CONCLUSION

For the foregoing reasons, we conclude that the trial court did not abuse its discretion by denying appellant's second amended motion to suppress. Accordingly, we affirm the trial court's judgment of conviction.

_____

Melissa Goodwin, Justice

Before Chief Justice Rose, Justices Goodwin and Smith

Affirmed

Filed: December 31, 2020

Do Not Publish